# In the United States Court of Appeals for the Ninth Circuit

---

JAMES BLANKINSHIP,
*Plaintiff-Appellant,*
V.
UNION PACIFIC RAILROAD COMPANY,
*Defendant-Appellee.*

---

On Appeal from the United States District Court for the District of Arizona
Case No. 4:21-cv-00072-RM (The Hon. Rosemary Marquez)

## CORRECTED OPENING BRIEF OF PLAINTIFF-APPELLANT

JAMES H. KASTER
LUCAS KASTER
NICHOLS KASTER, PLLP
4700 IDS Center
80 South 8th St.
Minneapolis, MN 55402
(612) 256-3200

MATTHEW W.H. WESSLER
GUPTA WESSLER PLLC
2001 K Street NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
*matt@guptawessler.com*

JESSICA GARLAND
GUPTA WESSLER PLLC
100 Pine Street, Suite 1250
San Francisco, CA 94111
(415) 573-0336

May 4, 2023

*Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

Table of authorities ........................................................................... iii

Introduction ....................................................................................... 1

Jurisdictional statement .................................................................... 4

Statement of the issue ...................................................................... 4

Statement of the case ....................................................................... 4

    A.    Union Pacific hires Mr. Blankinship as a railroad conductor and he performs his job without incident for ten years. ................................................................ 4

    B.    Under changes to Union Pacific's fitness-for-duty program, the company diagnoses Mr. Blankinship with a vision deficiency and excludes him from his job. ................... 6

    C.    The *Harris* class action represents more than 7,000 Union Pacific employees—Mr. Blankinship among them. ............................ 7

    D.    Following the decertification of the *Harris* class, Mr. Blankinship files his own EEOC charge and his own ADA action. ....................................................................... 13

    E.    Union Pacific successfully moves for summary judgment on the grounds that Mr. Blankinship's suit was untimely. .................. 14

Summary of argument ..................................................................... 18

Standard of review .......................................................................... 20

Argument ......................................................................................... 21

    I.    Under *American Pipe*, Mr. Blankinship's suit is timely. ........................... 21

        A.    For the last fifty years, *American Pipe* has entitled putative class members to the tolling of the statute of limitations on their claims until and unless the class is decertified. ............................................. 21

B.     Mr. Blankinship's suit is timely because he was entitled to *American Pipe* tolling as a member of the *Harris* class. ............................................................... 24

II.     The district court's contrary logic distorts *American Pipe* tolling beyond all recognition. ........................................... 28

Conclusion ............................................................................................. 37

# TABLE OF AUTHORITIES

## Cases

*American Pipe & Construction Co. v. Utah,*
 414 U.S. 538 (1974)................................................................*passim*

*Arch of Kentucky, Inc. v. Director, Office of Workers' Compensation Programs,*
 556 F.3d 472 (6th Cir. 2009) ........................................... 22

*Barryman-Turner v. District of Columbia,*
 115 F. Supp. 3d 126 (D.D.C. 2016) ................................. 29, 34

*Bridges v. Department of Maryland State Police,*
 441 F.3d 197 (4th Cir. 2006) ........................................... 24, 34

*Burnett v. New York Central Railroad Co.,*
 380 U.S. 424 (1965).......................................................... 22

*California Public Employees' Retirement System v. ANZ Securities, Inc.,*
 582 U.S. 497 (2017).......................................................... 21

*Casey v. Albertson's Inc,*
 362 F.3d 1254 (9th Cir. 2004) ......................................... 21

*China Agritech, Inc. v. Resh,*
 138 S. Ct. 1800 (2018) ..................................................... 21

*Crown, Cork & Seal Co. v. Parker,*
 462 U.S. 345 (1983).......................................................*passim*

*Harris v. Union Pacific Railroad Co.,*
 329 F.R.D. 616 (D. Neb. 2019).......................................*passim*

*Harris v. Union Pacific Railroad Co.,*
 953 F.3d 1030 (8th Cir. 2020) ......................................... 13

*Menhorn v. Firestone Tire & Rubber Co.,*
 738 F.2d 1496 (9th Cir. 1984)......................................... 22

*Oswalt v. Resolute Industries, Inc.,*
 642 F.3d 856 (9th Cir. 2011) ........................................... 20, 21

*Sawtell v. E.I. du Pont de Nemours & Co.,*
 22 F.3d 248 (10th Cir. 1994)..................................................................... 35

*Smith v. Pennington,*
 352 F.3d 884 (4th Cir. 2003)..................................................................... 35

*Tosti v. City of Los Angeles,*
 754 F.2d 1485 (9th Cir. 1985)............................................................24, 29

## Statutes

42 U.S.C. § 12112(a) ............................................................................. 7, 14

42 U.S.C. § 12112(b)(6) ........................................................................ 7, 14

42 U.S.C. § 12117(a) ................................................................................. 28

42 U.S.C. § 2000e-5(e)(1) ......................................................................... 28

## Other Authorities

Eric Kindel, *Nine decades on, Japanese army doctor's invention is still being*
 *used to test colour vision* (Eye Magazine Summer 2005).........................5

# INTRODUCTION

Nearly fifty years ago, the U.S. Supreme Court in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), set out an important bright-line tolling rule. Whenever a class action is filed, the statute of limitations is tolled as to all asserted members of the class—until or unless class certification is denied, or they receive notice of the class and decide to opt out. That rule, the Court explained, serves the twin aims of a limitations period, on the one hand, and of Federal Rule of Civil Procedure 23, on the other: It ensures that defendants have notice of the nature and scope of the claims against them, and it spares the litigation system from the repetitious filings of class members attempting to preserve their claims.

That rule should have applied here. In 2016, a group of Union Pacific employees commenced a class action against the company in a case called *Harris v. Union Pacific Railroad Company*. In that case, the workers alleged that the railroad discriminated against workers with disabilities in violation of the Americans with Disabilities Act by routing workers suspected of various health conditions into its "fitness-for-duty" program, where it applied restrictive criteria to bar them from jobs they had previously performed without issue. James Blankinship was one such worker. For the better part of a decade, he worked as a conductor for the company and performed his duties safely and effectively. But in 2017, as part of a routine recertification, he failed an exam meant to test his ability to detect multicolored

traffic signals. Suspecting him of a color vision deficiency, Union Pacific subjected him to its fitness-for-duty procedures: It suspended him from work without pay, imposed further testing and evaluation, and, ultimately, barred him from most roles with the company.

Throughout the *Harris* litigation, both the parties and the district court consistently recognized that Mr. Blankinship, and other workers like him, were members of the putative class. Union Pacific included him on a list meant to capture the class; the plaintiffs provided declarations from workers just like him to support their motion for class certification; the district court explicitly held that similar workers were "class members" in its decision certifying the class; and, once the class was certified, the court ordered that notice be sent to everyone in the class—including Mr. Blankinship. And when Union Pacific challenged the class certification decision in the Eighth Circuit, it used the inclusion of workers like Mr. Blankinship as an illustration of the problems with class treatment.

But after Union Pacific successfully convinced the Eighth Circuit to decertify the class, the company promptly changed its tune. Having left Mr. Blankinship and those like him with no choice but to pursue their own individual cases, Union Pacific turned around and asserted in each of those cases that it was too late. For the first time, it claimed that these workers had in fact not been members of the *Harris* class

when the plaintiffs moved to certify, and thus that their individual claims were now time-barred.

The district court in Mr. Blankinship's individual case agreed. But to reach that conclusion, it distorted the *American Pipe* tolling rule beyond all recognition. Ignoring what everyone in *Harris* had actually said about who was in the class, it opted to put the definition of the class the plaintiffs sought to certify under a microscope and attempted to come up with its own preferred understanding that, post hoc, excluded certain categories of workers. The finer points of the class definition, the court decided, revealed an intent to narrow the class and exclude people like Mr. Blankinship, thereby depriving them of tolling.

The district court's approach to *American Pipe* tolling is unprecedented, and no authority supports it. For good reason: Left to stand, the district court's decision subverts the purposes of the doctrine altogether, requiring class members to file repetitious filings to guard against the risk that some later court, separated in time and space from the class litigation, will misunderstand the class and deem them excluded from it. And that fear would be well founded because that is exactly what happened here. The *Harris* plaintiffs never excluded people like Mr. Blankinship from the class. To the contrary, as everyone in *Harris* repeatedly affirmed, they were intended to be class members—and thus were entitled to tolling until the class was decertified or they opted out. This Court should reverse the district court's error.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Federal Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.*; 3-ER-580. This Court has jurisdiction over the appeal under 28 U.S.C. § 1291 because the district court granted final judgment to the defendant on all claims. 1-ER-25; 1-ER-14. The district court entered its order granting summary judgment to Union Pacific on September 6, 2022. 1-ER-25. And the district court entered its order denying Mr. Blankinship's motion for relief from judgment on November 2, 2022. He timely filed a notice of appeal from both orders under Federal Rule of Appellate Procedure 4(a)(1)(A) & (4)(A) on December 1, 2022. 2-ER-27.

## STATEMENT OF THE ISSUE

Did the district court err in refusing to apply *American Pipe* tolling and holding instead that Mr. Blankinship's Americans with Disabilities Act claim was time-barred even though he was a member of a previous class action that raised the same claim?

## STATEMENT OF THE CASE

### A.   Union Pacific hires Mr. Blankinship as a railroad conductor and he performs his job without incident for ten years.

In 2007, Union Pacific hired James Blankinship as a railroad conductor. 1-ER-17. One of the tasks of that job is reading multicolored railroad traffic signals. 1-ER-16–17. As a result, the job requires a degree of color vision acuity—not perfect color vision, but, as the Federal Railroad Administration has recognized, color vision

sufficient to recognize and distinguish colored signals. 1-ER-16–17; 3-ER-420–21. The FRA requires periodic certifications that conductors possess these abilities. 1-ER-16. That certification starts with an FRA-approved color vision acuity examination— such as the Ishihara test, which requires takers to examine a series of colored disks to identify what numbers or figures they depict. 1-ER-17; *see also* Eric Kindel, *Nine decades on, Japanese army doctor's invention is still being used to test colour vision* (Eye Magazine Summer 2005), https://perma.cc/W2KE-NP4W. And if an employee fails that examination, FRA regulations provide for "further medical evaluation," such as through "another approved scientific screening test or a field test." 1-ER-17.

For Mr. Blankinship's first ten years with the company, that is what Union Pacific did. In 2007, when he was first hired, he took and passed the Ishihara test. *See* 4-ER-583. A few years later, he failed the Ishihara test, but passed a follow-up field test meant to match his everyday working conditions. 1-ER-17–18; 3-ER-421; 3-ER-515–16; 3-ER-543. And a few years after that, Union Pacific administered the Ishihara test again, and Mr. Blankinship passed. 3-ER-518; 4-ER-583. Throughout this period, Mr. Blankinship performed his job safely, diligently, and consistently—not once misreading a traffic signal. 3-ER-427.

**B.** **Under changes to Union Pacific's fitness-for-duty program, the company diagnoses Mr. Blankinship with a vision deficiency and excludes him from his job.**

But then Union Pacific changed its approach. Beginning in 2014, the company made dramatic changes to its internal "fitness-for-duty" program, deciding that employees suspected of having certain medical or physical conditions should be suspended from work without pay, required to undergo further evaluation, and, frequently, restricted altogether from work with the company. 4-ER-582.

So when, in January 2017, Mr. Blankinship failed an Ishihara test, the company didn't offer him the field test it had used before. Instead, his result "triggered" the fitness-for-duty program. 4-ER-582. He was suspended from his conductor position. 3-ER-520; 4-ER-583. In lieu of its prior field test, Union Pacific required him to take a new, proprietary "Light Cannon" test the company had developed in-house—even though that test wasn't modeled on real-world conditions and flunked the FRA's minimum validation standards. 3-ER-424–27; 4-ER-582–83. And when Mr. Blankinship failed that proprietary test, Union Pacific's Chief Medical Officer applied strict new criteria to diagnose him with a "Color Vision Deficit" that the company deemed "unable to be accommodated." 3-ER-409; 3-ER-428. As a result, Union Pacific removed Mr. Blankinship from his conductor job, and imposed permanent work restrictions that barred him from working in any position requiring the identification of traffic signals. 1-ER-19.

Mr. Blankinship attempted to find another position with the company, but was repeatedly rebuffed. His request for work in the railcar department was denied. 4-ER-584. He asked for assistance identifying an alternative role, but got none. 4-ER-584. And he took and passed the company's Operations Management Test Battery and applied to work as a manager—but Union Pacific refused to allow him to undergo its management training program. 4-ER-584.

## C. The *Harris* class action represents more than 7,000 Union Pacific employees—Mr. Blankinship among them.

**1.** Unfortunately, Mr. Blankinship was not unique. Since 2014, thousands of Union Pacific employees have, on account of the company's concerns about their health, been automatically excluded from their jobs, subjected to fitness-for-duty criteria, and, often, barred from their positions altogether. 4-ER-579. In 2016, several employees made these practices the subject of a class-action lawsuit against Union Pacific. *Harris v. Union Pacific Railroad Company*, No. 8:16-cv-381 (D. Neb.). They argued that the company discriminated against employees with disabilities and perceived disabilities in violation of the Americans with Disabilities Act in a variety of ways, including because its fitness-for-duty policies screened individuals with disabilities out of its workforce "even though, they argue, they had no trouble performing the essential functions of their jobs." *Harris v. Union Pac. R.R. Co.*, 329 F.R.D. 616, 620–23 (D. Neb. 2019), *reversed*, 953 F.3d 1030 (8th Cir. 2020); *see* 42 U.S.C. §§ 12112(a), (b)(6).

The *Harris* plaintiffs centered their claims on the changes Union Pacific made to its fitness-for-duty program in 2014. At that time, Union Pacific decided that workers with a wide range of medical conditions posed an "unacceptable safety risk" to the company and tasked a small cadre of doctors and nurses with implementing standardized, automatic policies to screen those workers out of many of the company's roles. 3-ER-294–95; *Harris*, 329 F.R.D. at 623. To identify whom to target, the company required workers to disclose any "Reportable Health Event"—"any new diagnosis, recent event[], and/or change" in a specified list of conditions, ranging from Type I Diabetes to severe sleep apnea to a significant vision change. 3-ER-458–59. But disclosure wasn't the only way employees could be routed into the fitness-for-duty program. As Union Pacific's "former Chief Medical Officer" put it, a "reportable health event" that "triggers" the company's "fitness-for-duty policy" could also be "discovered" "in the course of . . . a regulatory medical exam." 3-ER-362–63; *see also Harris*, 329 F.R.D. at 620. Nor was such a "reportable" event required to be "new" in the sense that Union Pacific didn't know about it previously: Union Pacific "may [even] have known about" a particular medical issue "ten years" before, but not acted on it until its new fitness-for-duty program was in place. 3-ER-360–62; *see also, e.g.*, 3-ER-462–63 (shifting treatment of a longstanding epilepsy diagnosis).

If a worker disclosed such an event or condition (or if Union Pacific learned about one on its own), they were suspended from work and routed into a fitness-for-

duty evaluation. 3-ER-456; 4-ER-579. During such an evaluation, the company's medical team collected information about the worker and relied on broad, population-based risk assessments to make a final judgment about whether they would be permitted to perform their role. 3-ER-461. The result, the *Harris* plaintiffs alleged, was that a large group of Union Pacific employees who were "qualified and performing their jobs with no problems" were nonetheless "pulled from their jobs" and left with no recourse. *Harris*, 329 F.R.D. at 620–21.

**2.** At the outset of the *Harris* litigation, the plaintiffs asserted ADA claims on behalf of a class defined as follows:

> Individuals who were removed from service over their objection, and/or suffered another adverse employment action, during their employment with Union Pacific for reasons related to a Fitness-for-Duty evaluation at any time from 300 days before the earliest date that a named Plaintiff filed an administrative charge of discrimination to the resolution of this action.

3-ER-471.

But as discovery got underway, Union Pacific complained that this proposed class definition was overbroad. *See* 3-ER-345–46. In particular, the company claimed that the class would be unwieldy and overinclusive—potentially reaching hundreds of thousands of employees—if it required only a fitness-for-duty evaluation, without being in some way tied back to the company's concept of a "Reportable Health Event." *See* Counsel Letter on Interrogatories at 2–4, *Harris v. Union Pac. R.R. Co.*, No. 8:16-cv-381 (D. Neb. Feb. 5, 2019), ECF No. 215-4. That was inconsistent with the way

that Union Pacific "understood" the plaintiffs' claims—which, it said, "revolve[d] around fitness-for-duty evaluations that were initiated because of a Reportable Health Event." *Id.* As a result, it suggested that the class should encompass only those workers who "were subject to a Fitness for Duty Evaluation related to" such a "Reportable Health Event." 3-ER-345–46.

The case proceeded on this understanding. When asked to "identify all employees" who would "fall within" the "putative class[]," Union Pacific noted it would do so based on its understanding of who the class included and applied its "Reportable Health Event" restriction to produce a spreadsheet of 7,723 current or former Union Pacific employees. 3-ER-345–46.

And when, not long thereafter, the plaintiffs moved to certify a class, they made crystal-clear that the class they had in mind included each of the "more than 7,000" Union Pacific employees the company had identified. 3-ER-310. Incorporating language like what Union Pacific had suggested, the plaintiffs defined the class as "All individuals who have been or will be subject to a fitness-for-duty examination as a result of a reportable health event." 3-ER-310. That definition, the plaintiffs explained, was intended to "match" "the list of over 7,000 individuals that [Union Pacific] identified in discovery" because "[t]he company represented on multiple occasions that these were the individuals who had been 'subject to a Fitness for Duty Evaluation related to a Reportable Health Event' and that this was the list

of class members." 2-ER-255. On behalf of this class, the plaintiffs pursued a "disparate treatment" claim—that Union Pacific's fitness-for-duty program discriminated against people with disabilities in violation of sections 12112(a) and (b)(6) of the ADA, including by employing discriminatory standards and criteria that screened them out of the workforce. 3-ER-311–12.

Within this proposed class were a range of workers with different conditions, all of whom were subject to Union Pacific's fitness-for-duty program for having what the company viewed as reportable health events or conditions, and all of whom were ultimately suspended from their jobs. That included workers who, like named plaintiff Harris, had long been diagnosed with conditions like epilepsy. *See* 3-ER-462–63. It included workers who, like named plaintiff Baker, suddenly began to experience isolated bouts of lightheadedness. *See* 3-ER-463–65. And it included workers who, like Mr. Blankinship, were suspected of a color vision deficiency because they failed an Ishihara test during a routine FRA recertification. Indeed, many such workers, including Mr. Blankinship, appeared on Union Pacific's class list. *See* 3-ER-328–30. And three workers who were subject to Union Pacific's policy based on the same suspected color vision issues—Justin Donahue, Leonard Barkmeier, and Kent Kirk—signed sworn declarations in support of the motion for class certification. 2-ER-241–50.

**3.** On February 5, 2019, the district court certified the *Harris* plaintiffs' proposed class. *Harris v. Union Pac. R.R. Co.*, 329 F.R.D. 616, 628 (D. Neb. 2019). Adopting the class definition put forth by the plaintiffs, the district court noted that the plaintiffs' motion was supported by declarations "from 44" such "class members," referencing the batch that included Barkmeier, Donahue, and Kirk. 329 F.R.D. at 624 & n.3. It then acknowledged that each of these declarants had "experienced the discrimination alleged" by the now certified class. *Id.* And lest there be any doubt about who the court had in mind, it "approve[d]" the sending of "notice to the" "class list" "given to plaintiffs by Union Pacific . . . identif[ying] a total of 7,723 current and former employees"—again, including among them Mr. Blankinship. *Id.* at 627–28.

That certification order was, however, short-lived. Union Pacific appealed the district court's decision to the Eighth Circuit, complaining that the certified class totaled "more than 7,000" workers who had experienced a "broad[] universe of conditions or events"—ranging from those who "suffered a stroke" to others that "experienced vision deficiencies." 2-ER-54–57; 2-ER-78–79; *see* 2-ER-116. Union Pacific argued that the case posed many individualized questions—not simply on behalf of the class representatives, but also on behalf of each of the "7,000-plus absent class members." 2-ER-78–79. The need to prove the existence and impact of each different class member's disability, for instance, was "illustrated" by the "personal

stories" of the 44 declarants, including those whom the company's Ishihara test tagged with vision deficiencies. 2-ER-78–79 (citing Mr. Barkmeier's declaration). And that was only one difference among "each of the 7,000-plus class members": They would also need to prove that they were qualified for a wide range of different jobs, like that of a conductor—a point for which Union Pacific again referenced someone it had deemed to have a vision deficiency because he had failed a regularly scheduled recertification vision exam. *See* 2-ER-131; 2-ER-245–46 (citing Mr. Donahue's declaration).

On March 24, 2020, the Eighth Circuit agreed with Union Pacific: It granted the company's request and decertified the class. *Harris v. Union Pac. R.R. Co.*, 953 F.3d 1030, 1033 (8th Cir. 2020).

## D. Following the decertification of the *Harris* class, Mr. Blankinship files his own EEOC charge and his own ADA action.

With the class action terminated, Mr. Blankinship decided to pursue individual relief. A few weeks after the Eighth Circuit's decision, on April 10, 2020, he filed a discrimination charge with the EEOC. 1-ER-20. The EEOC completed its review on November 18, 2020, and Mr. Blankinship filed this action fewer than 90 days later, on February 10, 2021. 1-ER-20; 4-ER-581.

In that action, Mr. Blankinship alleged on his own the same discrimination claim the *Harris* class had pursued on his behalf. As in *Harris*, Mr. Blankinship explained, the reason he was removed stemmed from one of Union Pacific's fitness-

for-duty policies—here, its practice of treating suspected color-vision deficiency as triggering a fitness-for-duty evaluation, and its practice of using that evaluation to summarily exclude otherwise qualified employees from service. 4-ER-580. That policy, Mr. Blankinship alleged, discriminated against him in violation of the ADA because it "removed him from service . . . on the basis of his real or perceived disability" and because it involved "qualification standards, employment tests, or other selection criteria that screen[ed]" him, as "an individual with a disability," out of employment with the company. 4-ER-580; 4-ER-585 (citing 42 U.S.C. §§ 12112(a) and (b)(6)).[1]

## E. Union Pacific successfully moves for summary judgment on the grounds that Mr. Blankinship's suit was untimely.

Union Pacific moved for summary judgment. In addition to several arguments on the merits, the company argued that Mr. Blankinship's suit was time-barred. *See* 3-ER-551–58. The company did not dispute that Mr. Blankinship was a "purported member[]" of the *Harris* class when the action began. *Am. Pipe*, 414 U.S. at 553. It thus did not dispute that, under the U.S. Supreme Court's decision in *American Pipe*, he, like everyone in that class, was entitled to have the statute of limitations on his claim tolled until or unless the class was decertified or he opted out. Nor did it dispute that

---

[1] Mr. Blankinship initially alleged that these policies amounted to discrimination in violation of the ADA both because they were facially discriminatory and because they had a disparate impact. On appeal, however, he pursues only his disparate-treatment theory.

Mr. Blankinship had filed both his EEOC charge and federal complaint well within the allowable time periods following the Eighth Circuit's decertification decision. But the company insisted that the suit was nevertheless untimely because, it said, Mr. Blankinship's entitlement to tolling in fact ended years earlier—not at the time the Eighth Circuit decertified the class, but on August 17, 2018, when the *Harris* plaintiffs moved for class certification.

To support that novel theory, Union Pacific pointed to the definition of the class that the *Harris* plaintiffs sought to certify. In a few sparse pages in its motion briefing, the company insisted that the class definition actually excluded people like Mr. Blankinship: Even though Union Pacific had identified Mr. Blankinship as a member of the very class the *Harris* plaintiffs ultimately proposed, *see* 3-ER-345–46, and even though its own papers in *Harris* repeatedly cited the declarations of class members situated just like him, *see* 2-ER-241–50, the company now argued that Mr. Blankinship actually didn't count, 3-ER-551–52. That was true because, according to Union Pacific, Mr. Blankinship hadn't experienced a "reportable health event" as the company defined the term: Even though Union Pacific's own Ishihara test had flagged him for possible color vision issues, it now argued that Mr. Blankinship had experienced neither a "new diagnosis," nor any other "recent event," but rather had been subjected to screening and removed from his conductor position for other reasons not captured by the class definition. 3-ER-551–52.

Mr. Blankinship opposed the motion. As he explained, *American Pipe* means that "[t]he timely filing of a class action tolls the running of the applicable statute of limitations for putative class members' claims until a decision is reached whether to certify the class." 3-ER-434–35 (quoting *Am. Pipe*, 414 U.S. at 539). That approach makes sense because the filing of the class action serves the same purpose the filing of an individual action would: It provides a defendant with notice of the substantive claims being brought against it, thereby ensuring that a defendant is aware of those claims, and who may assert them, before "evidence has been lost, memories have faded, and witnesses have disappeared." 3-ER-434–35 (quoting *Am. Pipe*, 414 U.S. at 554). Any rule to the contrary would require plaintiffs to file vast numbers of redundant, independent suits—undermining "litigative efficiency and judicial economy." 3-ER-434–35 (quoting *Am. Pipe*, 414 U.S. at 555–56).

That rule applied here, Mr. Blankinship explained, for straightforward reasons. Union Pacific employees like Mr. Blankinship, whom the company suspected of color vision deficiency, subjected to fitness-for-duty protocols, and removed from service, were members of the proposed *Harris* class. 3-ER-435. They were entitled to *American Pipe* tolling from the outset of the *Harris* litigation, through class certification, up until the point that the Eighth Circuit determined that the class should be decertified. 3-ER-435. Nothing about the definition of a "reportable health event" could undermine that conclusion, and that was for two reasons: people like

Mr. Blankinship *did* experience such an event, and no one in the *Harris* proceeding suggested otherwise; and in any event, *American Pipe* tolling doesn't hinge on flyspecking the definition of a proposed class. 4-ER-436–37.

The district court accepted Union Pacific's tolling theory. It acknowledged that the filing of the *Harris* action satisfied the basic "policies underlying statutory limitations periods," and entitled the class to tolling under *American Pipe*. 1-ER-22. But it nevertheless decided that Mr. Blankinship's entitlement to tolling ceased when the plaintiffs filed their motion for class certification. Apparently accepting Union Pacific's parsing of the term "reportable health event" in the class definition, the court reasoned that what happened to Mr. Blankinship was not, technically speaking, a "result of" such an event. 1-ER-24. Mr. Blankinship, the court said, should have figured that out and filed an individual EEOC charge, rather than believing that the class action continued to preserve his rights. 1-ER-24.

Following the district court's decision, Mr. Blankinship filed a motion for relief from judgment. 3-ER-384. He argued that Union Pacific had misled the court in its initial summary judgment papers because it had obscured the fact that the proposed *Harris* class was intended to capture people like Mr. Blankinship. 3-ER-370–82. Throughout the *Harris* class-certification litigation, Mr. Blankinship explained, both parties believed that people like Mr. Blankinship remained a part of the class: He was on the parties' proposed class list, and he and people like him were routinely

included in discussions of the size and scope of the class. 3-ER-370–77. Union Pacific opposed the motion as a "proverbial and prohibited second bite at the apple." 2-ER-30. And the district court ultimately denied the motion, finding no basis to revisit its earlier decision. 1-ER-2.

## SUMMARY OF ARGUMENT

**I.A.** Under *American Pipe*, the filing of a class action suspends the applicable statute of limitations "as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." 414 U.S. at 554. That is for two reasons. *First*, the filing of a class action satisfies the notice and fairness objectives of limitations periods as to all the members of the asserted class, equipping a defendant with all the "essential information" it needs to defend itself against the claims of the class and any of its members. *Id.* at 555. And *second*, a contrary rule would frustrate the objectives of Rule 23 by encouraging class members to file repetitious papers and motions to preserve their claims. *Id.* at 551.

**I.B.1** *American Pipe* applies straightforwardly here. When the *Harris* class action was commenced, the proposed class included everyone who, like Mr. Blankinship, was removed from service for reasons related to a fitness-for-duty evaluation.

**2.** That did not change over the course of the litigation. When Union Pacific urged the plaintiffs to narrow the scope of the proposed class, it produced a corresponding class list that included Mr. Blankinship and others like him. When the

plaintiffs moved for class certification, they made clear that was the class they had in mind. When the district court certified the class, it did the same. And when Union Pacific appealed the class-certification order, it, too, treated workers like Mr. Blankinship as class members, complaining that their inclusion in the class was one reason it should be decertified.

**3.** Mr. Blankinship thus was entitled to *American Pipe* tolling until the Eighth Circuit decertified the class. Because he timely filed his EEOC complaint just a few weeks later, and then filed this federal suit fewer than 90 days after the EEOC's determination, his claim was timely as well.

**II.** The district court reached the contrary conclusion by ignoring what happed in the *Harris* litigation and instead attempting to decide, based solely on its own effort to define the contours of the class definition, who it encompassed and who it excluded. It reached the wrong result with the wrong approach.

**A.** *First*, the district court misapplied the class definition. It believed that the class excluded Mr. Blankinship for two reasons: He did not suffer a reportable health event since he believed his vision didn't change, and he was not subjected to the fitness-for-duty program because of such an event. But everyone in *Harris* understood that workers in Mr. Blankinship's circumstances were class members. They didn't understand the definition's terms as strictly as the district court did, and even if they had, Mr. Blankinship's failure of the Ishihara test *was* a reportable health event that

led the company to believe that he had experienced a vision change—and that was why he was routed into the fitness-for-duty program.

**B.** *Second*, the district court was wrong to piece apart the class definition of its own accord, and it cited no authority for its novel approach. At best, it pointed to two appellate decisions that it interpreted to mean that, every time a class-certification motion articulates a narrower class definition than a class complaint does, "the narrower decision controls for purposes of *American Pipe* tolling." But the cases the court cited do not stand for that broad rule. And even if such a rule existed, it wouldn't apply here.

**C.** *Third*, the district court's approach abandons the equities *American Pipe* tolling is supposed to reflect. Under that approach, putative class members would be required to monitor class proceedings, track and parse changes in a class definition, and affirmatively disregard statements of the parties and the district court indicating that they are and remain class members. But *American Pipe* explicitly divested class members of any duty to monitor a class suit. Imposing that duty on them anyway would invite the very multiplicity of filings the doctrine is meant to avoid.

## STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment de novo. *Oswalt v. Resolute Indus., Inc.*, 642 F.3d 856, 859 (9th Cir. 2011). The Court "view[s] the evidence in the light most favorable to the nonmoving party" and determines

"whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Id.* And this Court reviews motions for relief from judgment for abuse of discretion. *Casey v. Albertson's Inc*, 362 F.3d 1254, 1257 (9th Cir. 2004). A "district court abuses its discretion if it does not apply the correct law or if it rests its decision on a clearly erroneous finding of material fact." *Id.*

## ARGUMENT

### I.  Under *American Pipe*, Mr. Blankinship's suit is timely.

#### A.  For the last fifty years, *American Pipe* has entitled putative class members to the tolling of the statute of limitations on their claims until and unless the class is decertified.

In *American Pipe & Construction Co. v. Utah*, the U.S. Supreme Court set out a straightforward rule: "The commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." 414 U.S. at 554. For the last half-century, that rule has meant that, for every putative class member, the limitations period remains tolled until and unless "class certification is denied"—at which point "class members may" either "chose to file their own suits," or decide "to intervene as plaintiffs in the pending action." *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 354 (1983). The Court has repeatedly reaffirmed these basic principles. *See, e.g.*, *China Agritech, Inc. v. Resh*, 138 S. Ct. 1800, 1806–07 (2018); *Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, 582 U.S. 497, 509 (2017).

The reasons for that rule, *American Pipe* explained, are common sense. Statutes of limitations serve an important objective. They prevent plaintiffs from sitting on their rights, barring "the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared." *Am. Pipe,* 414 U.S. at 554. In doing so, they "assure fairness to defendants," *Burnett v. N.Y. Cent. R.R. Co.*, 380 U.S. 424, 428 (1965), and ensure that defendants are "on notice" of the claims they might face, *Crown, Cork*, 462 U.S. at 352. At the same time, "considerations of fair notice to plaintiffs" support "protecting unwary litigants against the inadvertent loss" of their claims "through the running of the statute of limitations." *Menhorn v. Firestone Tire & Rubber Co.*, 738 F.2d 1496, 1500 n.3 (9th Cir. 1984). A statute of limitations, in other words, is not designed "as a trap for the unwary or unsophisticated." *Arch of Kentucky, Inc. v. Dir., Off. of Workers' Comp. Programs*, 556 F.3d 472, 482 (6th Cir. 2009).

Where an *individual* suit is concerned, these considerations generally mean that each claim must be filed within a set period of time from the offending conduct—unless "the interests of justice," such as a defendant's own role in delaying or concealing a claim, "outweigh[]" the general "policy of repose." *Burnett*, 380 U.S. at 428.

But when it comes to a class action, different logic kicks in. Once a class action complaint has been filed, the "purpose of [a] limitation provision" has been satisfied

not simply as to "the named plaintiffs," but also as to "*all* those who might subsequently participate in the suit." *Am. Pipe*, 414 U.S. at 551 (emphasis added). That is because, by filing the class action complaint, the named plaintiff has taken care of the defendant's notice and fairness concerns, informing it "not only of the substantive claims against [it], but also of the number and generic identities of the potential plaintiffs who may participate." *Id.* at 555. That means the defendant possesses the "essential information" to defend itself against each of the proposed claims—from the "subject matter" of "the prospective litigation" to its expected size and scope— before those claims become stale. *Id.* The defendant will, as a result, be well "aware of the need to preserve evidence and witnesses respecting the claims of all the members of the class." *Crown, Cork*, 462 U.S. at 353. And the defendant won't be surprised when, should a class action prove untenable, it faces the class members' individual claims. *See id.*

Nor could putative class members "be accused of sleeping on their rights" if they declined to file their own protective intervention motions or competing suits. *Crown, Cork*, 462 U.S. at 352. Indeed, requiring them to take those steps would "frustrate" the "principal function" of a class suit altogether by encouraging the "unnecessary filing of repetitious papers and motions"—the very "multiplicity of activity which Rule 23 was designed to avoid." *Am. Pipe*, 414 U.S. at 550–51. That is why Rule 23 "both permits and encourages class members to rely on the named

plaintiffs to press their claims." *Crown, Cork*, 462 U.S. at 352–53. And so, *American Pipe* held, class members are entitled to be thought of as "parties to the suit" for limitations purposes "until and unless they receive[] notice thereof and cho[ose] not to continue." 414 U.S. at 551.

The *American Pipe* tolling rule is both broad and concrete. *See Bridges v. Dep't of Maryland State Police*, 441 F.3d 197, 212 (4th Cir. 2006) (explaining that the Supreme Court in *American Pipe* was "highly sensitive to the need for certainty of a bright-line rule"). It applies whether or not putative class members are aware of the underlying class proceedings. *See Am. Pipe*, 414 U.S. at 553. It applies whether, following decertification, class members seek to intervene in the initial class action, or whether they instead opt to file their own individual suits. *Crown, Cork*, 462 U.S. at 350. It applies irrespective of "the substantive reason" for the denial of class certification— because any contrary approach would end up encouraging the very premature intervention that the rule was designed to avoid. *Bridges*, 441 F.3d at 211. And it applies even where an individual plaintiff's claims vary in some respects from those asserted by the class—so long as the filing of that class enabled the defendant to anticipate the plaintiff's claims. *Tosti v. City of Los Angeles*, 754 F.2d 1485, 1489 (9th Cir. 1985).

**B.** **Mr. Blankinship's suit is timely because he was entitled to *American Pipe* tolling as a member of the *Harris* class.**

*American Pipe*'s tolling rule applies here. As explained below, when the *Harris* action was commenced, Mr. Blankinship was a putative member of the proposed

class. Throughout the life of the class action, that never changed. And once the class was decertified and the limitations period began to run again, Mr. Blankinship filed an EEOC charge, and then a federal complaint, raising the same claim that was the basis for the *Harris* class action well within the allotted time. He therefore was entitled to *American Pipe* tolling on that claim.

**1.** When the *Harris* class action was filed, the proposed class included Mr. Blankinship—and every Union Pacific employee who, like him, was removed from service after being subject to a fitness-for-duty exam based on the failure of an Ishihara exam during a routine recertification. *See* 3-ER-471 (describing the class as "[i]ndividuals who were removed from service over their objection, and/or suffered another adverse employment action . . . for reasons related to a Fitness-for-Duty evaluation"). Mr. Blankinship was a Union Pacific employee who "suffered [an] adverse employment action," as the class definition required, 3-ER-471: He was removed from his conductor position and faced onerous work restrictions that prevented him from finding a position with the company, 1-ER-19. And he suffered those consequences for "reasons related to a Fitness-for-Duty evaluation": His failure of the Ishihara vision test "triggered" a fitness-for-duty evaluation that led to his being suspended without pay, subjected to a proprietary, unvalidated color vision exam, and, ultimately, diagnosed with a color vision deficiency that the company deemed "unable to be accommodated." 3-ER-408; 3-ER-428.

Under *American Pipe*, Mr. Blankinship was entitled to rely on the filing of the *Harris* class action to toll the statute of limitations on his claim. The filing of *Harris* informed Union Pacific of the nature of the claim against it, and of the identities of the class members whose claims it had reason to expect—including people just like Mr. Blankinship. *See Am. Pipe*, 414 U.S. at 551. Union Pacific was thus equipped with all the "essential information" it needed to defend itself against his claim. *Id.* at 555. And Mr. Blankinship, for his part, was entitled to rely on the filing of the class suit to preserve his claim, without any duty to "take note of the suit" or to "exercise any responsibility with respect to it." *Id.* at 552.

**2.** Throughout the *Harris* litigation, that didn't change. The class always included workers like Mr. Blankinship.

As an initial matter, that was true at all times between the filing of the complaint and the filing of the motion to certify the class. For instance, during discovery, Union Pacific objected to the potential scope of the plaintiffs' initial proposed class. *See* 3-ER-345–46. The company insisted that the plaintiffs narrow their proposed class definition—specifically, that they focus on workers who faced the fitness-for-duty process for reasons related to, or that resulted in some way from, the types of medical events or conditions the company viewed as "reportable health events." *See* 3-ER-345–46. And when the plaintiffs asked Union Pacific to identify all of those workers who would "fall within" what the company saw as the appropriate

class definition, the 7,723-person list Union Pacific responded with included Mr. Blankinship among them. 3-ER-329–30; 3-ER-345–46.

And it remained true when the plaintiffs moved for class certification. The plaintiffs' motion adopted the class definition Union Pacific had proposed, treating Union Pacific's "list of over 7,000 individuals"—the very list that included Mr. Blankinship—as "the list of class members." *See* 2-ER-255 (referencing the list); 3-ER-310 (same). And the declarations the plaintiffs provided in support of their certification motion likewise included testimony from the same sorts of workers as Mr. Blankinship. 2-ER-241–50. As the plaintiffs explained, these workers met the class definition because they were among those to whom the fitness-for-duty policy was "applied in a discriminatory manner" as a result of a "reportable health event." 3-ER-304; 3-ER-306. After all, one of the "conditions" Union Pacific treated as such a "reportable health event" was a "recent event" in "color vision" acuity—the very problem the Ishihara test was meant to detect. 3-ER-497–98.

The district court's order certifying the class likewise included class members like Mr. Blankinship. The district court recognized that each of the 44 "class members" who submitted declarations, including those class members who, like Mr. Blankinship, were subject to the fitness-for-duty program as a result of a failed Ishihara vision test during a recertification process, had "experienced the discrimination alleged" by the now certified class. *Harris,* 329 F.R.D. at 624 & n.3; *see*

*also* 2-ER-241–50. And the court "approve[d]" the sending of notice to Union Pacific's entire 7,723-person "class list"—including Mr. Blankinship himself. *Harris*, 329 F.R.D. at 627–28. Union Pacific, too, recognized that the district court's certification order included these workers: It cited their declarations as "illustrat[ions]" of the workers in the class, and it argued on appeal that the class was overbroad precisely because of their inclusion. *See, e.g.*, 2-ER-87–88; 2-ER-116; *see also* 2-ER-67; 2-ER-79.

**3.** That makes this an easy case. As a member of the *Harris* class, Mr. Blankinship was entitled to *American Pipe* tolling from the moment the class was filed up until the moment the Eighth Circuit decertified the class. *See Crown, Cork*, 462 U.S. at 353–54 (explaining that, "[o]nce the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied"). At that point, he had 300 days from that order to file his EEOC complaint, *see* 42 U.S.C. § 2000e-5(e)(1); 42 U.S.C. § 12117(a), and he filed well within that window. 3-ER-581. And after the EEOC finished its investigation, Mr. Blankinship likewise filed his federal complaint within the 90 days the agency allowed. 3-ER-581. His claim was thus timely, and he should have been allowed to pursue it.

## II. The district court's contrary logic distorts *American Pipe* tolling beyond all recognition.

To bar Mr. Blankinship's claim, the district court set aside this lengthy history and the straightforward tolling principles the Supreme Court announced in *American Pipe*. The district court did not point to anything anyone in *Harris* had said or done

to indicate an intent to exclude from the class everyone who, like Mr. Blankinship, was routed into the fitness-for-duty program for failing the Ishihara vision test during a routine recertification. Instead, it zeroed in on the revised class definition Union Pacific had insisted the plaintiffs adopt. Undertaking its own definitive construction of the meaning of that definition, the court proceeded to decide which class members were in, and which were out.

This was error twice over. *First*, it misapprehends the record. If the court had paid attention to what actually happened in *Harris*, it would have understood, as the parties and court in *Harris* did, that Mr. Blankinship was never excluded from the class. And *second*, the district court was wrong to embark on its own, merits-inflected parsing of the precise contours of the class definition and of how that definition might apply to individual plaintiffs. The "*American Pipe* rule" does not "vary based on the individual equities invoked by each former, putative class member." *Barryman-Turner v. District of Columbia*, 115 F. Supp. 3d 126, 133 (D.D.C. 2016). Rather, it turns on whether a given *defendant* had adequate notice of the basic nature of the claims against it. *Tosti*, 754 F.2d at 1489. Subtle changes to a class definition, like those the *Harris* plaintiffs made here, do not somehow rob a defendant of the notice the initial filing of the class supplied. The interests *American Pipe* safeguards are thus not served by picking through modest changes to a class definition with a fine-toothed comb, and the district court was wrong to have done so here.

**A.** Begin with the district court's flawed understanding of the class definition. The court zeroed in on two technical points: the phrasing of the class definition the company had insisted that the plaintiffs adopt, and the finer points of what the court thought counted as a "reportable health event" under Union Pacific's medical rules. 1-ER-23–24. According to the district court, parsing these details revealed that when the *Harris* plaintiffs moved for certification, they conclusively excluded Mr. Blankinship from the class—along with all the other *Harris* class members who were routed into the fitness-for-duty program for failing the Ishihara vision test during a routine recertification. The district court's logic is badly flawed.

For starters, Mr. Blankinship and his peers were *never* "excluded" from the *Harris* class. To reach its contrary conclusion, the district court made two findings. First, it said that a reportable health event had to involve a vision *change*, and Mr. Blankinship had claimed consistent vision. 1-ER-23–24. And second, it asserted that Mr. Blankinship had been subjected to the fitness-for-duty program because of an FRA certification process—not because of such a vision change. 1-ER-23–24.

There are multiple problems with this theory. First, it flies in the face of everything that happened in *Harris*. As we have explained, both the parties and the district court in *Harris* explicitly recognized that the certified class included class members like Mr. Blankinship. *See Harris*, 329 F.R.D. at 627–28 (certifying a class that included the full "class list" of 7,723 class members United Pacific had prepared, and

which included Mr. Blankinship); 2-ER-253 (plaintiffs relying on that same list in moving for certification); 2-ER-116 (Union Pacific agreeing that the certified class comprised that same group of "more than 7,000 current and former Union Pacific employees"); 2-ER-54 (similar). Everyone also recognized that each of the declarants offered in support of the class-certification motion had experienced the same discrimination alleged by the class—including three who were subjected to the fitness-for-duty program after a routine recertification just like Mr. Blankinship. *Harris*, 329 F.R.D. at 624 & n.3; 2-ER-67; 2-ER-79; 2-ER-241–50; 3-ER-304; 3-ER-306. Union Pacific even explicitly premised several of its arguments for decertification on the inclusion of these exact workers. 2-ER-67; 2-ER-79; 2-ER-87–88; 3-ER-289; 3-ER-304. It was only after Union Pacific successfully employed these arguments to win decertification that it changed its tune.

The district court's theory also flatly contradicts what Union Pacific said in *Harris* about the scope and meaning of the class definition. For example, as the plaintiffs pointed out in *Harris*, Union Pacific itself "refers to" the fitness-for-duty policy's required disclosures "interchangeably" as "reportable health events" and "reportable health conditions"—illustrating that what matters is the sort of health condition a worker had, not how Union Pacific learned about it. 3-ER-295. And the company said nothing about demanding a strict causal relationship between a reportable health event and a fitness-for-duty evaluation because it treated causal

language ("evaluations that were initiated *because of* a Reportable Health Event") as the equivalent of looser constructions ("evaluations *related to* Reportable Health Events"). *Compare* Counsel Letter on Interrogatories at 2–4, *Harris*, No. 8:16-cv-381, ECF No. 215-4, *with* 3-ER-345–46.

But even if these representations were disregarded, the record does not support the district court's finding that Mr. Blankinship was subjected to the fitness-for-duty program because of a recertification process rather than a reportable health event. Mr. Blankinship may have taken the Ishihara test because of a recertification process, but the reason he was routed into the fitness-for-duty program was because he experienced a medical event: He failed that test. As he put it in his complaint: the Ishihara test "triggered a Fitness-for-Duty evaluation" and resulted in Union Pacific's removing Mr. Blankinship "from work as a conductor." *See* 4-ER-583. So, whether or not Mr. Blankinship *in fact* experienced a change in his color vision, Union Pacific subjected him to its fitness-for-duty procedures because it thought he might have—that's why it was willing to employ him as a conductor before his 2017 Ishihara test result, and why it suspended him without pay and applied its strict new fitness-for-duty criteria afterwards. Nothing about the FRA recertification process required the company to take those steps. And as the company's own former chief medical officer explained, the company understood "reportable health events" as not

simply changes employees reported to the company, but also as conditions the company itself could discover in the course of one of its own exams. 3-ER-360–62.[2]

Nor did Union Pacific ever once suggest, even as it urged the plaintiffs to adopt a narrower class definition, that doing so would impose the exclusions the district court here purported to uncover. Just the opposite. When Union Pacific insisted that the plaintiffs in *Harris* narrow their proposed definition, it told them that its objective was simply to capture "the factual allegations pled and the Named Plaintiffs' claims," Counsel Letter on Interrogatories at 2, *Harris*, No. 8:16-cv-381, ECF No. 215-4, and to prevent the class from becoming unworkably overbroad, 3-ER-345–46. That couldn't have meant excluding every worker who did not experience a "change" in their condition, because the very first named plaintiff, Mr. Harris, was routed into the fitness-for-duty program not because of some sort of change in his longstanding epilepsy diagnosis, but because he re-disclosed that diagnosis and Union Pacific decided to start treating him differently. *See* 3-ER-462–63.

**B.** There is an even more fundamental problem with the district court's theory. The district court was wrong to ground Mr. Blankinship's entitlement to

---

[2] What's more, even if the district court's interpretation of the class definition were accepted, Mr. Blankinship did experience exactly the sort of "change" it thought was necessary. In 2013, Mr. Blankinship's vision was good enough to pass the Ishihara test, but by 2017, that was no longer the case. *See* 4-ER-583–84. That change—a "recent health event" under any interpretation of Union Pacific's policy—led to the fitness-for-duty program and his work restrictions. *See id.*

*American Pipe* tolling on its own view about how to best interpret and apply the subtle changes to the *Harris* class definition. The availability of *American Pipe* tolling has never turned on the decision of a new court—one that was a stranger to the initial class proceedings—to pick apart a class definition and conclude that, under some technical, heretofore unexamined nuance, a particular plaintiff wasn't included.

In fact, *American Pipe* demands exactly the opposite: Its tolling rule applies to "all those who *might* subsequently participate in the suit." *Am. Pipe*, 414 U.S. at 551 (emphasis added). Expressly anticipating that there could be some ambiguity in the outer contours of a given class, the Supreme Court in *American Pipe* chose not to base the availability of its tolling rule on the equities of a particular plaintiff's case. *Barryman-Turner*, 115 F. Supp. 3d at 133. Instead, it chose to establish a "bright-line rule": The statute of limitations "remains tolled for all members of the putative class until class certification is denied for whatever reason." *Bridges*, 441 F.3d at 212. The resulting doctrine is an equitable one, and it recognizes that the objectives of limitations periods, and of Rule 23, are best served by tolling a limitations period for putative class members until and unless it is abundantly clear that they are not a part of the class. *Am. Pipe*, 414 U.S. at 551–55.

To support its contrary view, the district court cited two appellate decisions that, it said, stood for the proposition that when a class-certification motion articulates a narrower class than a class complaint, "the narrower definition controls

for purposes of *American Pipe* tolling." 1-ER-23. As an initial matter, the court misread those decisions, which stand for no such rule. Both addressed situations in which the initial scope of the class was unclear—not situations in which a class was subsequently narrowed. *See Sawtell v. E.I. du Pont de Nemours & Co.*, 22 F.3d 248, 253 & n.10 (10th Cir. 1994) (class certification motion made clear that class defined to include "all other individuals similarly situated" was intended to capture only residents of one particular state); *Smith v. Pennington*, 352 F.3d 884, 891–93 (4th Cir. 2003) (class-certification motion clarified an "uncertainty" in the initial class complaint).

And even if an *unambiguous* narrowing of a proposed class could deprive excluded class members of *American Pipe* tolling, as we explained above, that is far removed from what happened here. In *Harris*, the named plaintiffs, the district court, and Union Pacific repeatedly suggested that people like Mr. Blankinship were members of the proposed class, going so far as to include him on the list of class members entitled to class notice.

**C.** The district court's reasoning also unavoidably conflicts with the core objectives of the doctrine. Consider what the district court's approach would demand of people like Mr. Blankinship. He would have needed to closely monitor the progress of the *Harris* proceedings. He would have needed to follow the change in the class definition, and to carefully parse what it might mean. On top of all that, he would have needed to *affirmatively disregard* what each of the parties in *Harris* had

said—that he personally appeared on the proposed class list, along with others like him; that similarly situated workers had experienced the very discrimination the class was supposed to capture; and that their inclusion in the class was one of the reasons why it was supposedly overbroad. And he would have needed to *affirmatively disregard* what the federal district court that actually presided over the class litigation told him—that, because he appeared on the class list along with other similarly situated workers who were "class members," he was entitled to class notice. *Harris*, 329 F.R.D. at 624.

*American Pipe* has never required this sort of sophisticated attention from putative class members. To the contrary, as the Supreme Court observed nearly fifty years ago: Class members have no "duty to take note of" a pending class suit "or to exercise any responsibility with respect to it in order to profit from the eventual outcome of the case." *Am. Pipe*, 414 U.S. at 552. A putative member of the original class therefore certainly has no duty to keep track of the consequences of the phrasing or rephrasing of the class definition when both parties and the court already told him he was included in the certified class.

To nevertheless deprive someone who had every reason to think he was a part of the class of *American Pipe* tolling would turn the doctrine on its head. At best, it would invite inefficiency, encouraging class members who are uncertain as to their class status to file the very "unnecessary filing of [protective] repetitious papers and

motions" that *American Pipe* tolling was intended "to avoid." 414 U.S. at 550–51. And at worst, it would allow defendants to spring traps for unwary class members by misleading plaintiffs, courts, and the class about the effect of changes to a proposed class until it is too late to correct the mistake. *American Pipe* tolling exists to prevent exactly this sort of confusion, and it should have been applied here.

## CONCLUSION

The district court's judgment should be reversed.

Respectfully submitted,

*/s/Matthew W.H. Wessler*
MATTHEW W.H. WESSLER
GUPTA WESSLER PLLC
2001 K Street NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
*matt@guptawessler.com*

JESSICA GARLAND
GUPTA WESSLER PLLC
100 Pine Street, Suite 1250
San Francisco, CA 94111
(415) 573-0336

JAMES H. KASTER
LUCAS KASTER
NICHOLS KASTER, PLLP
4700 IDS Center
80 South 8th St.
Minneapolis, MN 55402
(612) 256-3200

May 4, 2023

*Counsel for Plaintiff-Appellant*

## STATEMENT OF RELATED CASES

There are several cases pending before this Court that raise these issues:

1. *Donahue v. Union Pacific Railroad Company*, No. 22-16847

2. *DeFries v. Union Pacific Railroad Company*, No 23-35119


/s/Matthew W.H. Wessler
Matthew W.H. Wessler

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 9,064 words excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this reply brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

*/s/Matthew W.H. Wessler*
Matthew W.H. Wessler

*Counsel for Plaintiff-Appellant*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 4, 2023, I electronically filed the foregoing corrected opening brief with the Clerk of the Court for the U.S. Court of Appeals for the Ninth Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the CM/ECF system.

*/s/Matthew W.H. Wessler*
Matthew W.H. Wessler

*Counsel for Plaintiff-Appellant*